UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Root Consulting, Inc., *et al.*,

    Plaintiffs,

v.

William Insull,

    Defendant.

Case No. 14 C 4381

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiffs Root Consulting, Inc., Scott Taylor, and Burr Ridge Frontage Road, LLC brought this action against Defendant William Insull, a shareholder and former vice president of Root Consulting. Plaintiffs allege four causes of action: (1) breach of fiduciary duty: (2) request for accounting; (3) business defamation; and (4) tortuous interference with a business relationship. [1]. Plaintiffs Root Consulting and Scott Taylor moved for summary judgment on their fiduciary duty claim. [57]. As explained below, that motion is granted.

### I. Background[1]

Root Consulting ("Root") is an Illinois-based corporation that specializes in information technology. PSOF ¶3. It does business in both Illinois and Texas. *Id.* Plaintiff Scott Taylor ("Taylor") is an Illinois resident. PSOF ¶4. He is the founder and president of Root, as well as a shareholder. *Id.* Defendant William Insull ("Insull") is a Texas resident; he is a shareholder of Root and was at one point the

---

[1] The facts in this section are principally taken from the parties' Local Rule 56.1 statements and the exhibits thereto. "PSOF" refers to Plaintiffs' statement of facts, with Defendant's responses. [63] at Ex. 2. "DSOF" refers to Defendant's statement of facts, with Plaintiffs' responses. [69].

company's vice president. PSOF ¶5. The parties dispute when Insull's term as vice president ended. Ans. PSOF ¶5. According to Plaintiffs, Insull served as vice president until February 28, 2014. PSOF ¶9. Defendant Insull, however, maintains that Root constructively terminated him when Taylor ceased to pay his salary in July 2013. Ans. to PSOF ¶¶9-10. Throughout his answer to Plaintiffs' statement of facts, Insull repeatedly states: "Defendant disputes the duration of time he served as Vice President because he was constructively terminated and frozen out from the corporation when Taylor unilaterally terminated Insull's compensation in July 2013." Ans. to PSOF ¶¶ 13-15. While Insull repeatedly makes the conclusory statement that he was constructively terminated, he presents no evidence showing that he actually left the company until February 28, 2014. In fact, Insull admitted in his Verified Answer that he "was a Vice President of Root Consulting, Inc. through February 2014." [17] at ¶5. Plaintiffs claim that Taylor did not constructively terminate Insull. Ans. DSOF ¶3. Instead, per Insull's request, the company paid him a salary of $1.00 per pay period to work as vice president of Root through February 2014. *Id.* This is confirmed by several emails showing that Insull continued to work as the vice president of Root between August 14, 2013 and February 6, 2014. [68] at Ex. E.

On or about October 23, 2013, Insull filed a certificate of formation for a new company, Royal Cabling Techsus LLC (also referred to as "RC Tech", "RC Tech Services", "RC Techus", "RC Tech.us" and "Root Services"). PSOF ¶¶11-12. In this Opinion, the Court will refer to Insull's new company as "Root Services." Like Root,

Root Services offered information technology services in the Houston area. *Id.* It performed that work for Root customers and other Houston-area customers between October 23, 2013 and February 28, 2014. PSOF ¶¶14-15.

The evidence shows that Insull solicited business and serviced Houston-area customers on behalf of Root Services between July 2013 and February 2014, without informing Root or Taylor of any potential business opportunities. PSOF ¶¶16-17. Insull maintains that he was constructively terminated as vice president of Root by the time Root Services solicited customers, and that he informed Taylor he had formed a competing business on or before January 2014. Ans. PSOF ¶¶17-18. The following section provides an overview of Insull's work on behalf of Root Services.

In September 2013, Insull submitted bids for work to Siemens, and Siemens in turn issued purchase orders to be paid to "RC Tech US, Root Tech Services" in October and November 2013. PSOF ¶¶19-20. Root's employees completed that work, using Root's supplies. *Id.* Insull does not dispute these facts, arguing only that Siemens was never a Root customer. Ans. PSOF ¶19.

Also during September 2013, Root won a contract to perform work for Granite Properties. PSOF ¶¶46-49. Insull maintains that Granite Properties then sought to decline that contract in December 2013, and that he informed Taylor of their decision. Ans. PSOF ¶¶46-49. Then, in March 2014, Insull issued a new invoice for IT work to Granite Properties, payable to Royal Cabling Techsus and Root Services. PSOF ¶48. Granite Properties paid that invoice in full. *Id.* Insull

3

argues that the payment was not related to the September 2013 Granite Properties contract, and that he supplied all materials and labor. Ans. PSOF ¶48.

In November 2013, Insull contacted Midtown Financial to sell IT services. PSOF ¶¶22-23. He did so without notifying Root or Taylor. *Id*. Insull eventually provided those IT services and, in January 2014, sent an invoice for the work to Midtown Financial. *Id*. The invoice was payable to Royal Cabling Techsus and Root Services, not Root. *Id*.

In December 2013, the law firm Lewis Brisbois, Bisgaaard & Smith ("LBBS") contacted Insull for certain IT work, and that work was later completed. PSOF ¶¶24-25. From the record, it is unclear who exactly completed that work. *Id*. LBBS paid Royal Cabling Techsus and Root Services for the work, but Insull did not notify Root or Taylor about the job. *Id*. Insull does not dispute these facts, noting only that LBBS was never a Root customer and that he paid for the work with his own funds. Ans. PSOF ¶¶24-25.

Also in December 2013, Root entered into an agreement to provide IT services to a company called Heath Consultants. PSOF ¶¶43-45. Root partially completed the work, and Heath Consultants paid Root in January 2014. *Id*. In April 2014, Insull issued an invoice to Heath Consultants for the remainder of the work on behalf of Royal Cabling Techsus and Root Services, which Heath Consultants paid. *Id*. Insull does not dispute these facts, but adds that he completed the work using his own labor and materials. Ans. PSOF ¶¶43-45.

Beginning in December 2013, Insull (on behalf of Root) exchanged e-mails with Goodman Networks regarding large proposals for work at a sports stadium in Houston. PSOF ¶50. Insull submitted four proposals for that work under the name of his company, Root Services. *Id*. Those proposals were for $905,000, $680,000, $580,000, and $9,645,000, respectively. *Id*. Despite Insull's efforts, the parties did not reach an agreement for the work. Ans. PSOF ¶50.

In January 2014, Insull bid on two contracts for IT work submitted by Wood Group Unity Mustang, touting Root's long-standing relationship with Wood Group. PSOF ¶51. But Insull submitted the bid under the name of his own company Root Services, not Root. *Id*. Ultimately, no work was performed for Wood Group Unity Mustang. Ans. PSOF ¶51.

In January 2014, Yang Ming (America) Corp. ("Yang Ming") contacted Root about the expiration of a maintenance agreement. PSOF ¶26. Insull sent Yang Ming a proposal for an extended hardware and software warranty, which Yang Ming paid to Royal Cabling Techsus and Root Services by invoice. PSOF ¶¶26-28. Insull does not dispute the facts of the Yang Ming transactions, adding only that he issued the extended warranty proposal after Root had stopped paying his salary and reimbursing him for expenses. Ans. PSOF ¶26.

Beginning in January 2014, Insull communicated with Universal Acoustics regarding certain IT work. PSOF ¶¶29-36. On February 5, 2014, Insull sent Universal a list of work to be performed. *Id*. Insull issued that list in the name of "Root Services." *Id*. On February 14, 2014, Universal signed off on the work. *Id*.

5

Throughout the Universal Acoustics transaction, Insull communicated with Universal both as vice president of Root and as an employee of Root Services. *Id.* Universal eventually issued a purchase order to Root for work in the amount of $8,165.48. *Id.* Insull responded by issuing an invoice to Universal that listed Root Services as the payee instead of Root. *Id.*

In January 2014, Insull reached out to Seabed Geo Solutions concerning the installation of A/V equipment, and ultimately issued a bid for that work on behalf of Root. PSOF ¶¶37-40. Insull later issued a different invoice for that work, this time in the name of Royal Cabling Techsus and Root Services, not Root. *Id.* Insull does not dispute these facts, arguing only that he paid for the materials and labor, not Root. Ans. PSOF ¶¶37-40.

Also in January 2014, Insull submitted a bid to Peritus International for a five-year phone system hardware and service agreement. PSOF ¶¶41-42. Insull submitted the bid, for $23,140.50, in the name of Root Services. *Id.* Despite the bid, no sale ever occurred. Ans. PSOF ¶42.

In February 2014, Jinny Corporation contacted Insull for phone licenses that were no longer available. PSOF ¶52. Two months later, in March 2014, Insull proposed a new phone system for Jinny Corporation. *Id.* Insull maintains that these two instances of contact were not related, but were two separate transactions. Ans. PSOF ¶52. Insull later issued a bid to Jinny Corp in the name of "RC Tech Service, as successor to Root Consulting, Inc. solely in Houston, TX." PSOF ¶53. After the work was complete, Jinny paid Root Services in full. PSOF ¶54.

6

Also in February 2014, Insull placed a bid for work with a company called Potrerito. PSOF ¶¶55-56. As part of that bid, Insull used supply lists from Root. *Id*. Insull admits that he used the lists, but notes that no sale ever occurred involving Potrerito. Ans. PSOF ¶¶55-56.

On February 27, 2014, the shareholders of Root held a meeting concerning Insull's work with the company. The minutes from that meeting appear to show that the parties reached an agreement regarding the dissolution of Root in Texas. [63] at Ex. 3. The validity of that agreement, and its effect, are disputed by the parties on several grounds. However, the agreement has no bearing on the Court's fiduciary duty analysis, as Insull's misconduct began prior to February 27, 2014. PSOF ¶¶ 19-56.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 713 (7th Cir. 2013). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must construe all facts and reasonable

inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

### III. Analysis – Breach of Fiduciary Duty

Plaintiffs claim that Insull breached his fiduciary duty as a vice president and shareholder of Root by: (1) forming a competing company; (2) soliciting and winning new business with that company; (3) using Root materials to solicit business from Root customers and potential Root customers; (4) communicating with Root customers for his new company; (5) performing work for Root customers and potential Root customers as and for his new company; and (6) being paid for work won and performed by his new company. [58] at 1. To prevail on a breach of fiduciary duty claim, Plaintiffs must show that a fiduciary duty existed, that the duty was breached, and that the breach proximately caused Plaintiffs' damages. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015) (citing *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000)). Because the parties dispute only the first and third elements, the Court will confine its analysis accordingly. The Court begins by considering the two alleged bases for Insull's fiduciary duty – his position as vice president and his role as a shareholder.

#### A. Fiduciary Duty as a Vice President

Plaintiffs claim that Insull owed a fiduciary duty because he was the vice president of Root until February 2014. Corporate officers, such as vice presidents, owe a fiduciary duty to their corporations. *Brown v. Tenney*, 532 N.E.2d 230, 235 (Ill. 1988); *Comedy Cottage, Inc. v. Berk*, 495 N.E.2d 1006, 1011-13 (Ill. App. Ct.

8

1986).  Corporate officers also owe a fiduciary duty to the shareholders of the corporation. *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 829 N.E.2d 818, 828 (Ill. App. Ct. 2005) (citing *Brown*, 532 N.E.2d at 235).  The general rule that employees may plan, form, and outfit a competing corporation while still working for the employer so long as they do not commence competition does not apply to corporate officers, as they stand on a different footing. *Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1059 (Ill. App. Ct. 1993).  Corporate officers have a "duty to act with utmost good faith and loyalty in managing the corporation and [are] prohibited from enhancing [their] own personal interests at the expense of corporate interests." *Maecker Point Villas Condo. Assoc. v. Szymski*, 655 N.E.2d 1192, 1194 (Ill. App. Ct. 1995) (internal citation and quotation omitted).

An officer's duty of loyalty includes the obligation to disavow any corporate opportunity where the officer's private interests would conflict with those of the corporation. *Comedy Cottage*, 495 N.E.2d at 1011.  Further, under the corporate opportunity doctrine a fiduciary cannot usurp a business opportunity that was developed through the use of corporate assets. *Dremco, Inc. v. South Chapel Hill Gardens*, Inc., 654 N.E.2d 501, 504-05 (Ill. App. Ct. 1995). The doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities "belonging" to the entity. *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 993 (Ill. App. Ct. 1993).  A corporate opportunity is defined as a "proposed activity [that] is reasonably incident to the corporation's present or prospective business and in which the corporation has the capacity to engage." *Dremco*, 654 N.E.2d at 505.  A

9

corporate officer's resignation does not sever liability for a breach of fiduciary duty based on transactions that began or were based upon information acquired while the officer was employed and completed after the officer resigned. *Veco Corp.*, 611 N.E.2d at 1059.

At issue here is whether Insull was actually a vice president of Root during the relevant time period – July 2013 through February 2014. If so, he owed a fiduciary duty during that time. In his response brief, Insull claims that he was constructively discharged in July 2013, and therefore did not owe a fiduciary duty as vice president. [63] at 5-6. In his verified Answer, however, Insull admits that he was a "Vice President of Root Consulting, Inc. through February 2014." [17] at ¶5. That answer is a binding "judicial admission," which removes the issue from contention at summary judgment. *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005). For purposes of this Opinion, then, the admission is taken as true. *Id.*; *United States Sec. & Exch. Comm'n v. Battoo*, No. 12 C 07125, 2016 WL 302169, at *7 (N.D. Ill. Jan. 25, 2016). Insull may not "simply disregard, or contradict, that admission because [he] now may regret it." *McCarthy v. Target Corp.*, No. 09 C 1548, 2012 WL 967853, at *9 (N.D. Ill. Mar. 19, 2012). The Court thus finds that Insull owed Plaintiffs a fiduciary duty as vice president until at least February 2014.

Even if the Court were to disregard Insull's binding judicial admission, it nonetheless would find that Insull owed a fiduciary duty as vice president during the relevant time period. Insull claims that he stopped being the vice president of

10

Root in July 2013 because he was constructively discharged when Plaintiffs stopped paying him. A constructive discharge occurs when an employee is "forced to resign because his working conditions, from the standpoint of the reasonable employee, [have] become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). There can be no claim for constructive discharge, however, where the employee does not resign. *Pashnick v. United Parcel Serv.*, No. 09 C 565, 2010 WL 4628523, at *4 (N.D. Ill. Nov. 8, 2010) ("Pashnick never resigned from her position at UPS . . . This is fatal to her claim"). Here, despite Insull's claim that the company stopped paying him, there is no evidence showing that he resigned or quit. To the contrary, the evidence shows that Insull remained working for Root until February 2014. Between July 2013 and February 2014, Insull conducted business via email as the vice president of Root Consulting. [68] at Ex. E, F. He also received reimbursement checks from Root for work done on behalf of the company. [68] at Ex. H. Those checks were written and deposited in December and February of 2014. *Id.* In light of the evidence before the Court, it cannot conclude that Insull was constructively discharged from his position as vice president because – between July 2013 and February 2014 – he never resigned or quit that position.

Finally, even if Insull had resigned at some point, that may not have been sufficient to free him from his fiduciary duties as vice president. The resignation of an officer "will not sever liability for transactions completed after the termination of the party's association with the corporation of transactions which began during the

11

existence of the relationship or were founded on information acquired during the relationship." *Veco Corp.*, 243 Ill. App. 3d at 161. Thus, depending on when Insull allegedly left the company, certain actions he took after his departure could nonetheless constitute a breach of fiduciary duty.

### B. Fiduciary Duty as a Shareholder

Plaintiffs also argue that Insull owed a fiduciary duty as a shareholder of Root. Shareholders in a close corporation owe to each other fiduciary duties similar to those of partners in a partnership. *Hagshenas v. Gaylord*, 557 N.E.2d 316, 322-23 (Ill. App. Ct. 1990). In other words, those shareholders have a duty to deal with the "utmost good faith, fairly, honestly, and openly with their fellow stockholders." *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1219 (7th Cir. 1995). In *Rexford*, the defendant shareholder was fired by plaintiff Rexford Rand, a close corporation. *Id.* at 1217. At the time of his termination, the defendant was the company's vice president, treasurer and a minority shareholder, owning 25% of the corporation's stock. *Id.* After his termination, the corporation neglected to file its annual report with the State of Illinois and it was administratively dissolved. *Id.* Following the dissolution, the defendant reserved the name Rexford Rand for his own use and secured a corporate charter in the company name, all without the knowledge of the remaining shareholders of Rexford Rand. *Id.* This prevented the plaintiff from re-incorporating under its prior name. *Id.* The corporation sued the defendant alleging that he breached his fiduciary duties as a shareholder by depriving the corporation of its name. *Id.* The defendant argued that his actions were not in

12

breach of any fiduciary duty because his duties ceased once he was "frozen out" of the business and terminated. *Id.*

On appeal, the Seventh Circuit rejected defendant's contention that his duty was discharged. Instead, the court held that the alleged freeze out "did not deprive [the defendant] of his status as a shareholder" and "as a shareholder in a close corporation, he should have placed the interests of the corporation above his personal interests." *Id.* at 1220-1221. The court determined that, even if the defendant was the victim of an improper "freeze out," that did not excuse his conduct. *Id.* According to the court, if "shareholders take it upon themselves to retaliate any time they believe they have been frozen out, disputes in close corporations will only increase." *Id.* at 1221. Instead of taking matters into their own hands, the Court explained: "aggrieved parties should take their claims to court and seek judicial resolution." *Id.* at 1221. "Minority shareholders have an obligation as *de facto* partners in the joint venture not to do damage to the corporate interests. If a minority shareholder harms the corporation through 'unscrupulous and improper sharp dealings' with the majority, he has breached his duty of loyalty . . . .Conduct by any shareholder which is intended to be detrimental to the welfare of the enterprise . . . is a breach of a duty of loyalty which all shareholders owe to the common venture." *Id.* at 1219-20.

Here, it is undisputed that Insull has been a 47.5% shareholder of Root from September 2003 until the present. PSOF ¶5; [63] at Ex. 3 (meeting minutes at ¶d). Insull admitted as much in his verified answer. [17] at ¶5. As such, he owed a

fiduciary duty to his fellow shareholders during the relevant time period. *Hagshenas*, 557 N.E.2d at 322-23.

Insull's argument against this conclusion is unavailing. Insull claims that he was "frozen out" and therefore did not owe a fiduciary duty as a shareholder. First, as a matter of law, this argument fails under *Rexford*. There, the Seventh Circuit explicitly stated: "The freeze-out did not deprive [defendant] of his status as a shareholder . . . and as a shareholder in a close corporation, [defendant] should have placed the interests of the corporation above his personal interests." *Id*. at 1220. The Court further explained that it was the "frozen out" party's responsibility to seek judicial resolution of his shareholder dispute, instead of taking matters into his own hands and breaching his fiduciary duty. *Id*. As such, the court affirmed the finding that defendant had breached his fiduciary duty even though he had been fired and allegedly "frozen out." *Id*. Under *Rexford*, even if Insull had been frozen out, it would not excuse his misconduct because he retained his status as a shareholder of Root. *Id*.

Second, Insull's argument fails because there are no facts in the record showing that he actually was frozen out as a shareholder. Insull cites several ways in which shareholders may be frozen out: deprivation of a voice in business decisions, being locked out of the business premises, denial of company information, declining to pay dividends, misapplication of corporate funds for personal purposes, and manipulation of stock values. [63] at 8-9. The court in *Rexford* explained that a "freeze out" refers to "the use of corporate control vested in the statutory majority

14

of shareholders or the board of directors to eliminate minority shareholders from the enterprise or reduce their voting power or claims on corporate assets to relative insignificance. A freeze-out implies a purpose to force upon the minority shareholder a change which is not incident to any other corporate business goal." *Rexford Rand*, 58 F.3d at 1216 n.3.

Insull has not presented evidence that he suffered any such conduct at the hands of Plaintiffs. As an initial matter, Insull was not a minority shareholder in Root, as both he and Taylor held 47.5% of the company stock. [1] at ¶¶4-5; [17] at ¶¶ 4-5. Additionally, Insull has provided no evidence showing that Plaintiffs took actions limiting his abilities as a shareholder. The only evidence adduced by Insull concerns his role as vice president – that Plaintiffs stopped paying him and stopped reimbursing his expenses. PSOF ¶9. The Court finds that Insull owed Root a fiduciary duty as both a shareholder and a vice president during the relevant time period.

### C. Damages

As to damages, Insull argues that "Plaintiffs have failed to connect the damages to a breach of fiduciary duty." [Response] at 11-12. According to Insull, "Illinois law permits, rather than requires, complete forfeiture of all compensation received by a defendant during the course of the breach of fiduciary duty," and it is too early in this case to determine whether Plaintiffs are entitled to damages based on his compensation. This misunderstands Plaintiffs' damage request. Plaintiffs are not asking for damages based on Insull's wages, but compensatory damages

based on the business that Insull wrongfully took from Root, along with punitive damages and pre-judgment interest. [58] at 13-14. All of this is properly awarded for a breach of fiduciary duty under Illinois law. *V.I.M. Recyclers, L.P. v. Magner*, No. 03 C 343, 2005 WL 1745657, at *16-20 (N.D. Ill. July 21, 2005). Further, Plaintiffs have provided sufficient evidence that the damages it suffered resulted from the misconduct by Insull – including emails, invoices, and payment information. PSOF ¶¶19-56. Thus, the Court finds that Plaintiffs have adequately connected their damages to Insull's breach of fiduciary duty.

That said, it is not appropriate for the court to grant a specific damage award at this time. As Plaintiffs note repeatedly in their brief, their damage calculation is not complete and needs to be supplemented as discovery progresses. [58] at 4 n.2, 6 n.12, 13, 13 n.7. Further, Insull has not submitted any evidence or argument as to the specific damage requests set forth by Plaintiffs. As such, the Court will reserve any specific determination of damages related to the breach of fiduciary duty for a future date.

**IV. Conclusion**

In light of the foregoing, Plaintiffs' motion for summary judgment on Count I is granted. This matter remains set for a status hearing on 3/8/16, at which time the parties shall come prepared to discuss: (1) how they wish to proceed on damages for Count I; (2) the status of discovery; and (3) the remaining case management dates – including a trial date.

IT IS SO ORDERED

Dated: March 2, 2016                                Entered:

                                                    _____
                                                    John Robert Blakey